## Bolen et al. v. Watson et al.

(Decided January 29, 1932.)

D. G. BOLEYN and MORRIS & JONES for appellants.

COMBS & COMBS for appellees.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Affirming in part and reversing in part.

John M. Bolen, on March 7, 1895, conveyed to his granddaughters, Lottie and Vella Frazier, sixty-eight acres of land in Knott county; their mother, Patricia Frazier, to have a life estate in a part of the land. The tract included his home place and he lived on the land with them until he died. Lottie Frazier married Melvin Watson in 1907, and after her marriage to Watson she and her husband, on December 20, 1910, conveyed to the Gibson Coal & Coke Company a one-half interest in the

coals and minerals in the land, excepting from the conveyance the oil and gas. She and her husband lived on the land about a year after her marriage. They then moved about twenty miles away and lived there about five years. They then moved to Fleming county, about one hundred fifty miles away, and have lived there since. On October 22, 1927, they executed a deed to her son Elzie Bolen, born out of wedlock, by which they conveyed to him her entire one-half interest in the tract of land, in consideration of $500. Elzie Bolen by a deed, executed November 12, 1927, in consideration of $310, conveyed to J. M. Bolen a one-half interest in the land that his mother had conveyed to him and two-thirds of all the oil and gas in the land, "for defending the title, paying lawyer's fees, costs, personal efforts, or doing necessary things to market the oil and gas."

On November 24, 1927, Lottie Watson and her husband, Melvin Watson, brought this suit to cancel these deeds and reinvest her with the title to the property on the ground that they were obtained by fraudulent representations and undue influence. The issues were made up; proof was heard, and on final hearing the circuit court entered judgment in favor of the plaintiffs as prayed. The defendants appeal.

At the time of the transaction Mrs. Watson was forty-two years old; Elzie Bolen was twenty-three years old. He was the son of his mother, born in her infancy. His father was her first cousin, Nathan Bolen, to whom she was never married. His mother lived with her mother, Patricia Frazier, in the old home on the place until after her marriage, and when she left there with her husband, Melvin Watson, she left Elzie with his grandmother, who raised him. Vella Frazier, some years later, married, and she and her husband then built another house on the place and moved in it. Thus things stood for many years. Mrs. Watson cannot read or write; her husband can read and write, but is not far advanced beyond his wife in education. He is a laborer and they were living on a small farm they had bought in Fleming county. Before the time the deed in question was made, gas was struck in the neighborhood of this land and one paying well was put down on it. John M. Bolen proposed a trade with Elzie Bolen if he would buy the land from his mother. To carry this trade out they went

together down to Fleming county to see her. She says that he obtained the deed from her by telling her this:

"He come in where I was getting dinner and says, 'Ma, will you sell your place?' and I says, 'I don't know whether I will or not.' He says, 'I am going to get married and someone has to take care of grandma and I'm going to Hindman, Monday to get married.' . . . He says, 'You know, ma, somebody has got to take care of grandma,' and says 'I'm going to Hindman Monday to get married and I will take care of grandma, and I'm going to build a house as soon as I get married.' Vella has thrown her down."

She agreed to sell him the land for $500, and that evening John M. Bolen went to a notary's house and got a blank deed and drew it up. The next morning they all went over to the notary's to acknowledge the deed. Elzie Bolen proposed to pay $5 cash and to give John M. Bolen's check for $195. Watson declined to accept the check, saying that he did not know whether it was good or not, and they then agreed to leave the papers there in the notary's hands to be delivered when the contract was carried out. John M. Bolen went home and returned in a few days with the $195, by this time Watson had decided that he was not willing to take the notes of Elzie Bolen that had been executed for $300, and John Bolen returned home and came back in about a week with the $300, which he paid over to the notary. The notary delivered him the deed and turned over the money to Mrs. Watson. Mrs. Watson testified that at the time of the transaction with her son she had forgotten that she had reserved the oil and gas rights in her deed that she had made in 1910, and that she did not know of the development of oil and gas in that country. She showed that the oil and gas rights were very valuable, making the value of the property at least three times $500. When John M. Bolen returned on his second trip, he told George Jamison, who was driving him to the place, that he would make thousands of dollars on the transaction by reason of the gas in the land. Before Bolen's return on the third trip, Jamison had told Mrs. Watson about this, and this brought back to her mind, so she says, that she had not sold her oil and gas rights in the land and she did not instruct the notary not to deliver

the deed because she thought she had no right to stop it if the $500 was paid. She also showed that her son was not about to get married and that her daughter Vella had not thrown down her mother. She testified that but for these misstatements of her son and her ignorance of the conditions she would not have signed the deed.

On the other hand, he introduced proof showing that his mother was back at Patricia Frazier's about once a year and had some knowledge of what was going on in the neighborhool and knew that this well had been put down. He said he did not take advantage of his mother and that the price he paid was the fair value of the land. There was no other testimony as to what took place between the mother and the son, and it is earnestly insisted for the appellants that the evidence here is not of that certain character that warrants the setting aside of the conveyance of land fully executed.

The deed in controversy was, admittedly, procured from the mother by her son. In Brown v. Slaton, 172 Ky. 793, 189 S. W. 1130, 1132, the court thus stated the rule:

> "Even when parties in good health stand in a confidential relation to each other, the burden is upon the stronger character who procures an advantage to show that the transaction was fair; and relief will be afforded in equity in all such transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed."

In Halcomb v. Halcomb, 230 Ky. 127, 18 S. W. (2d) 945, 946, the rule is thus stated:

> "In view of the confidential relationship, and attendant circumstances, the burden was on the son to show that the transactions were freely and voluntarily entered into and devoid of inequitable incidents."

In Hitchcock v. Tackett, 208 Ky. 809, 272 S. W. 52, 54, the court, after stating the rule applied where confidential relations exist, added this:

> "Not only so when the relationship is shown to exist there is imposed upon the one receiving the benefit the burden of showing either the absence of the exercise of such influence, or that the transac-

tion was had in perfect good faith on his part, and was equitable and just. This burden is imposed because of the relationship between the parties, and equity demands of the party receiving the benefit that he shall show by clear and convincing evidence that he took no advantage of his situation."

To the same effect, see Davidson v. Davidson, 180 Ky. 193, 202 S. W. 493, and cases cited.

Here the son was twenty-three years old. He resided on the land, and knew the existing conditions. He knew of the value of the land for oil and gas and from the circumstances it may be presumed that he knew that his mother had not conveyed the oil and gas; for the purpose of the trip was really to buy the oil and gas. This is shown by all the circumstances. His mother could not read or write; she had forgotten that she had reserved the oil and gas, when she deeded away in 1910 the other mineral. The price that she fixed for the land was only the price of the surface. The son knew this. The price so fixed was less than half the value of the property which was conveyed. He did not tell his mother about the existing condition as to oil and gas, although he knew that this constituted the main value of the property and this was the reason that he and John M. Bolen had come to try to buy the property. Certainly it cannot be said that this transaction was devoid of inequitable incidents. A mother's partiality for her son and desire to help him along in life may not be taken advantage of by the son for selfish purposes. While the son denies using the words that his mother says he used, he does admit telling her that the ring he had on was his sweetheart's ring and that they were engaged to be married. The mother was not proposing to sell her property until her son came and made his proposition to her. These facts are fully established, and fully warranted the circuit court in concluding that the deed was obtained by the son from his mother by reason of the influence exerted over her, in her ignorance of the actual conditions. The deed was therefore properly set aside under the authority above cited.

John M. Bolen showed that he had paid out $120 in money on his trips to complete the transaction and in having the deeds recorded. The court by its judgment adjudged the appellees a lien not only for the $500 and interest, but for the $120. On the cross-appeal this is

complained of. John M. Bolen was the party who procured the transaction and without him it would not have been had. He knew all the facts and stands in the same light as Elzie Bolen, who was a mere tool of his in the transaction. The money they expended in procuring this transaction was expended in their own behalf and was in no sense received by the grantors in the deed. Appellees have no lien on the land for this money and no right to recover it from Lottie Watson.

On the original appeal the judgment is affirmed; but on the cross-appeal the judgment is reversed, with directions to set aside so much of the judgment as adjudges a lien on the land for $120.